IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02053-MEH

CHERRY L. TAFOYA,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Plaintiff, Cherry L. Tafoya, appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **reverses and remands** the Commissioner's final order .

## BACKGROUND

### I.      Procedural History

      Plaintiff seeks judicial review of the Commissioner's decision partially denying her

application for DIB benefits filed November 12, 2010.[1]  [AR 148-49]  The agency initially denied

Plaintiff's application on March 22, 2011.  [AR 78-81]  Plaintiff requested and received a hearing

before an Administrative Law Judge [ALJ].  [AR 82]  The ALJ issued a written ruling on December

11, 2012, finding that Plaintiff was not disabled as of October 14, 2010, because considering

Plaintiff's age, education, work experience and residual functional capacity ("RFC"), there were jobs

existing in significant numbers in the national economy that Plaintiff could perform.  [AR 23, 37]

However, the ALJ gave Plaintiff a partially favorable decision, finding her disabled as of October

9, 2012.  [AR 23, 31]  The SSA Appeals Council subsequently denied Plaintiff's administrative

request for review of the ALJ's determination, making the SSA Commissioner's denial final for the

purpose of judicial review.  [AR 8.]  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed her Complaint

with this Court seeking review of the Commissioner's final decision.  *See* docket #1.

## II.      Plaintiff's Alleged Conditions

Plaintiff was born on November 8, 1958; she was 52 years old when she filed her application

for DIB benefits on November 15, 2010.[2]  [AR 64, 148]  Plaintiff's initial application for DIB

indicates generally that she became "unable to work because of [her] disabling condition" and that

she was "still disabled."  [AR 148]  She has a high school diploma, "took college classes," and "took

---

[1]Defendant's Response Brief incorrectly states that Plaintiff filed for DIB in December 2007, citing to a November 2010 application.  *See* docket #16 at 2; *but see* AR 148.

[2]Plaintiff files this appeal under the name Cherry Tafoya; the Court notes that throughout the record, Plaintiff is often referred to as "Sharon L. Tafoya."  [*See, e.g.*, AR 148 (where Plaintiff files for DIB under her name, Sharon L. Tafoya, and indicates that she has also used the name Cherry Lea Tafoya).]  Many of the medical records also use the name Sharon Tafoya.  For purposes of this appeal, the Court accepts both names as representing Plaintiff.

internal classes" and "drafting classes" through a former job. [AR 55] In the past, she worked as a property manager/leasing agent, a security guard, and a farrier. [AR 229]

A.     Physical Conditions

Plaintiff reported the following physical illnesses, injuries, or conditions in her application for DIB: tremors, balance problems, arthritis, stomach/digestive problems, and fatigue. [AR 64]

The record also notes that she has double vision [AR 606], disk herniation at L4-L5 and L5-S1 (with an annular tear and radiculopathy) [AR 350], and coccydynia (causing pain her tailbone and a need to stand up and walk around) [AR 388-89]. She also has left shoulder impingement and acromioclavicular joint arthopathy that required surgery in May of 2012. [AR 399] Additionally, she has Crohn's Disease, according to treating physician and gastroenterologist Jonathan Fishman, M.D. [AR 407], and she has Graves' Disease (an autoimmune disorder) [AR 352, 551].

B.     Mental Conditions

Plaintiff has the following mental impairments: bipolar disorder, anger management issues, depression, and memory/concentration problems. [AR 64]

Plaintiff had been diagnosed with bipolar disorder and took lithium to control it for 15 years, until she developed kidney disease, causing her nephrologist, Clancy Howard, M.D., in June 2010 to recommend lowering her dose to help her kidney function. [AR 270] Her neurologist, Jeff TamSing, M.D., on June 29, 2010, noted she had developed bilateral hand tremors and recommended she go off lithium, which she then did based on that advice and the advice of her psychiatrist at the time, Marita Keeling, M.D. [AR 274] Plaintiff's subsequent treating psychiatrist, Therese Marumoto, M.D., indicated that Plaintiff struggled to find effective medicine to regulate

her mood.  [AR 360-62]

### III.   Hearing Testimony

The ALJ held an administrative hearing on July 18, 2012.  [AR 100]  Plaintiff was represented by counsel and testified.  [AR 100, 54-62]  An impartial medical expert (ME) also testified at the hearing.  [AR 27, 47-54]  A vocational expert (VE) apparently was available at the hearing by telephone but did not testify or otherwise opine on the case.[3]  Plaintiff's Opening Brief, docket #13 at 11.

Plaintiff testified at the hearing, questioned by her attorney.  [AR 54-62]  She indicated that she has a high school diploma and "took college classes," and "took internal classes" and "drafting classes" through a former job.  [AR 55]  She worked various jobs, the ALJ noting an exhibit provided that showed Plaintiff worked formerly as a property manager/leasing agent, a security guard, and a farrier.  [AR 55, 229]  Plaintiff stopped working in 2009 after being laid off.  [AR 56]  She applied for unemployment with the intention of looking for a "job in my field," set up interviews, but "didn't do well."  [Id.]  During this time period, she took a test to apply for a job with the Transportation Security Authority (TSA).  [Id.]  She testified as follows about that experience:

> It was – it was work that I should have been able to do easily.  It was security work which I had done in the past.  And I was also at Martin [Martin Marietta, a former employer], very familiar with the work and was able to supervise people in that capacity without having that job title.  So, I went intp TS – whatever their names are

---

[3]The ALJ's opinion indicates that a hearing was held and "also appearing" were the impartial medical expert and, "William J. Tysdal, CRC, an impartial vocational expert." [AR 27] The AR also includes a curriculum vitae for this VE. [AR 126-29] Beyond those references, the AR is void of information from any VE.  Plaintiff explains this in her Opening Brief: "[A] vocational expert was present at the hearing by telephone.  The vocational expert was not sworn, and no vocational testimony was taken." Plaintiff's Opening Brief, docket #13 at 11.

– for a timed test.  And I was not able to complete it.  I don't even think I got halfway through it before the time limit was up.  And I realized that I was the last person in there and I had no concept of time.

[AR 57]  Her attorney then asked her which of her impairments most affect her ability to work, to which Plaintiff responded, "My inability to communicate.  And I – my mental capacity or lack thereof and being unable to mask that now where in the past I was able to mask it."  [*Id.*]  She noted at the hearing that she had gone off lithium for her bipolar disorder and had not yet found a drug to replace it that worked as well.  [*Id.*]

Plaintiff's counsel noted that Dr. Marumoto indicated that Plaintiff has good days and bad days with respect to the bipolar disorder.  [AR 58]  Plaintiff described a bad day:

> If I sit down to do paperwork, meaning filling anything out which, as you know, there's a lot of documentation in this process which I wasn't able to fill out by myself, which is very devastating – it takes me what in the past has taken me half an hour to an hour at the most takes me now eight hours. And once I do it, I am basically unable to function for two or three days afterwards.  And "unable to function" means I can't – in a lot of times comprehend what is going on around me. And I can't function in day-to-day processing, which means my family suffers.  And I become agitated and very angry.  And over time I compensate by withdrawing from my family and removing myself from the situation[,] which means I pick a part of the house where I pretty much stay by myself and request that they leave me alone.

[AR 58] She noted that there are "always more bad days than good days," including those from "mental lapses and the physical effects of the Crohn's disease," and "bad days" can last "anywhere from a week sold to four to five days."  [*Id.*]

Plaintiff also testified that she has "extreme pain in [her] tailbone" that makes it hard to sit, which she controls by standing and walking.  [*Id.*]  She said she can sit on a hard surface for less than five minutes and on "an extremely soft surface" for five to ten minutes if she has some

5

movement while sitting.  [AR 60]  But when she gets up from sitting, "the pain is excruciating" and she needs to "walk it off."  [*Id*.]  When she stands, she testified that her "right leg will go to sleep from the knee down which has happened in the past with no real diagnosis about that."  [*Id*.]  She did not know, however, how long she could stand at one time.  [*Id*.]  When asked by her attorney if she could show up to a job five days a week and perform work eight hours a day, she answered, "No." [*Id*.]

The ALJ asked Plaintiff how far she could walk at one time; she responded that if her daughter were involved, "I could just put it all out of my mind and take care of her ... [s]o I could walk as far as I needed to."  [AR 61]  The ALJ then asked Plaintiff how much weight she could lift without difficulty; Plaintiff responded that she no longer lifts "anything because I could pick up a glass of water and drop it ... I avoid lifting completely because I don't trust myself because I can't." [*Id*. (internal question from ALJ omitted).]

An impartial ME, psychologist Robert Pelc, Ph.D., also testified at the hearing. [AR 47-54] He noted that he had reviewed all of the medical records and said Plaintiff has "affective disorder," known "more recently as bipolar disorder."  [AR 49]  He indicated he "briefly scanned" supplemental reports provided by Plaintiff for the hearing, looking specifically for those relating to his psychological area of expertise and reviewing those.  [AR 49, 53]  He said that the treating physician's records from Dr. Marumoto provide "only a narrative of her treatment" and Dr. Keeling's "provides some narrative summary of her very extensive treatment." [AR 49-50]  He testified as follows:

So, I looked at all of those records.  I also started looking for other information that

6

> was going to be more detailed regarding these functional areas.  And the conclusion I came to was that the claimant did not appear to – in terms of the clinical evidence that was detailed – have significant impairment around activities of daily living.  I relied on Dr. Hodges' statements []who detailed out her activities of daily living, indicating that she attended to personal hygiene, did some childcare, drives, running [*sic*] errands, watches TV, prepares meals, goes to the grocery, visits with family and friends.  And those data in my opinion were consistent with the mild limitation I cited in that area.  Regarding social functioning, she is characterized in this record generally as Dr. Hodge[s] saying she visits with family and friends.  She's maintaining relationships.  In the last treatment referenced that Dr. Keeling makes in 11/29/10 when she sees her last, she characterizes her as cheerful, congruent affect, logical, able to communicate.  And all of that in my opinion [is] consistent with the moderate limitation I cited in that area.

[AR 49-50, internal cites to record removed.] The ME continued, citing to treating physicians' records and opinions, noting that even on "bad days" (which he notes are not characterized in terms of frequency or trigger points that might cause those bad days) the data in the record "was consistent with the moderate limitation" he cited.  [AR 50-51]  He further noted Dr. Keeling's opinion that Plaintiff had a decline in functioning after 2006 that led to Plaintiff's mood being less stable; however, the ME found no objective data to support that. [AR 51]  Still, the ME indicated that the ALJ could "consider one decompensation or deterioration based on Dr. Keeling's comment," noting that any advancing physical problems were outside his scope of experience.  [AR 51-52]  He concluded: "I did not find data that supported limitations that were greater than the moderate limitations that I've cited.  There are opinions that [] differ with that but there are no clinical evidence that in my opinion would be the kind of clinical evidence to support greater than moderate limitations." [AR 52]

The ALJ asked the ME how many steps Plaintiff could understand, remember and carry out; the ME answered two- and three-step operations, which is "slightly more than simple and

repetitive." [*Id*.] The ALJ also asked the ME for his opinion regarding Plaintiff's ability to function with the public, supervisors, and coworkers. [*Id*.] The ME indicated "frequent." [*Id*.]

Upon questioning by Plaintiff's attorney, the ME acknowledged that Plaintiff's number of physical conditions could affect her mental functioning. [AR 53] The ME said he was "very hesitant to go into any statement of opinion regarding her physical health, either the single impact of any particular illness or the cumulative impact" as it was outside his area of expertise to do so. [AR 53-54] He also answered affirmatively that he could not comment regarding Dr. Marumoto's medical source statement that gave different functional limitations based on whether "it's a good day or a bad day," nor could he opine on whether Plaintiff's functioning deteriorates on a bad day. [*Id*.]

The ALJ issued a partially favorable decision on December 11, 2012. [AR 23-38]

## LEGAL STANDARDS

### I.   SSA's Five-Step Process for Determining Disability

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(I), 423, 1382.

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d

903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff was not disabled prior to October 9, 2012, but became disabled on that date and has continued to be disabled through the date of the ALJ's decision.  [AR 27] Going through the five-step process, the ALJ at Step One found that the Plaintiff had not engaged in substantial gainful activity since "the alleged onset date," October 14, 2010.  [AR 23, 27] Further, at Step Two, the ALJ determined that "since the onset date of October 14, 2010," Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, sleep apnea, obesity, osteoporosis, asthma, and bipolar disorder versus major depressive disorder.  [AR 29] Next, at Step Three, the ALJ found that Plaintiff did not have as of October 14, 2010, the alleged onset date of

10

disability, an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment. [*Id.*]

At Step Four, the ALJ found that since October 14, 2010, Plaintiff had an RFC making her unable to perform any past relevant work, but at Step Five, the ALJ used the Medical-Vocational rules (known as GRID rules) to find that Plaintiff had the RFC to perform unskilled light work, leading to a finding of "not disabled" before October 9, 2012. [AR 38]  However, starting October 9, 2012, the ALJ found that Plaintiff's physical functioning deteriorated, basing that on an independent functional abilities evaluation done at request of Plaintiff before the ALJ issued an opinion, in which an occupational therapist opined that Plaintiff was disabled.  [AR 608-37]  The ALJ also noted that after October 9, 2012, Plaintiff had double vision, citing to Plaintiff's additional exhibits sent to the ALJ after the hearing. [AR 35, citing AR 606-07][4]

In his opinion, the ALJ walked through physical finding in turn, starting with back pain, indicating that he also was considering obesity and its "cumulative side effects" in his analysis. [*Id.*]  With regard to psychiatric review, the ALJ notes that MaryAnn Wharry, Ph.D., "opined the [Plaintiff's] degree of functional limitation was 'mild' in restriction of activities of daily living, and 'moderate' in difficulties in maintaining social functioning and in difficulties maintaining concentration, persistence, or pace, and found no episodes of decompensation of an extended duration." [AR 31]  The ALJ also quoted Dr. Pelc, the independent psychologist who testified as the ME, noting Plaintiff's degree of functional limitation was "mild" in restriction of activities of daily

---

[4]The Court notes, however, that the original record before the ALJ at the hearing indicated double vision issues years before 2012.  [ALJ 332-47]

living and "moderate" in difficulties maintaining social functioning and concentration, persistence,

or pace.  The ALJ noted Dr. Pelc's testimony that the record demonstrated no "global functioning

scores" and that Plaintiff had full activities of daily living, socially maintained relationships and

communication ability, had a mental status exam within normal limits, and that there was no

documentation of any episodes of decompensation in the record.  [AR 31]

> The ALJ then determined that Plaintiff prior to October 9, 2012, had the RFC to:

> lift and carry 20 pounds frequently, sit for 4 hours at one time and for 8 hours total
> in an 8-hour workday, stand for 1 hour at one time and walk for 1 hour at one time
> and stand/walk for 4 hours total in an 8-hour workday, continually reach bilaterally
> except reach overhead only occasionally with the left upper extremity, continuously
> handle, finger, feel and push/pull bilaterally, frequently operate foot controls
> bilaterally, occasionally climb stairs and ramps but should never be required to climb
> ladders or scaffolds, frequently balance, occasionally stoop, kneel, crouch and crawl,
> frequently tolerate exposure to operating a motor vehicle and extreme heat and
> occasionally tolerate exposure to moving mechanical parts, humidity and wetness,
> pulmonary irritants, extreme cold, and vibrations, but never to tolerate exposure to
> unprotected heights, who has mild limitations (i.e., there is a slight limitation in this
> area but claimant can generally function well) in an ability to understand and
> remember simple instructions, carry out simple instructions, and make judgments on
> simple work-related decisions, and moderate limitations (i.e., there is more than a
> slight limitation in this area, but claimant is still able to function satisfactorily) in an
> ability to understand and remember complex instructions, carry out complex
> instructions, make judgments on complex work-related decisions, interact
> appropriately with the public, interact appropriately with supervisors, interact
> appropriately with co-workers, and respond appropriately to usual work situations
> and to changes in a routine work setting, and is capable of both simple and complex
> functioning with an ability to understand, remember and carry out two- to three-step
> instructions, and is limited to frequent interaction with the public, co-workers, and
> supervisors.

[AR 31]

> The ALJ notes the need to follow a two-step process in assessing the RFC: (1) to determine

whether there is an underlying medically determinable physical or mental impairment(s) that could

reasonably be expected to produce Plaintiff's pain or other symptoms; and (2) to evaluate the intensity, persistence, and limiting effects of the symptoms to decide the extent to which they limit Plaintiff's ability to do basic work activities.  [AR 32]  The ALJ noted that the second part of that process requires him to assess Plaintiff's credibility "based on a consideration of the entire case record."  [*Id.*]  After "careful consideration of the evidence," the ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," however, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully persuasive prior to October 9, 2012, with a complete review of the evidence not leading to a conclusion that claimant was totally disabled and unable to sustain any work activity prior to October 9, 2012."  [AR 32]  The ALJ went on to explain that credibility of Plaintiff was affected by her testimony that her job was terminated on May 29, 2009, and she alleges she later became "disabled" and unable to work as of October 14, 2010, "this despite not even attempting any work activity."  The ALJ continued:

> Prior to October 2012, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual, with relatively infrequent trips to the doctor for the allegedly disabling symptoms for treatment that has been essentially routine and/or conservative in nature.

The ALJ then cites to the record in making findings of fact. [AR 32-46] He provides a paragraph analysis on each of the opinion medical evidence solicited by the agency. [AR 33-36] He notes the opinion of Dr. Thurman Hodge, D.O., who did a consultative evaluation and concluded "claimant could sit for 8 hours in an 8-hour workday, stand for 8 hours in an 8-hour workday, walk for 8 hours in an 8-hour workday, bend, squat, and crawl, lift and carry 40 pounds, and could perform daily

activities and repetitive motions.  [AR 33, 302-08]  The ALJ then cites Dr. Anne Winkler, M.D., a specialist in rheumatology, who completed a physical medical source statement in which she opined that Plaintiff "could lift and carry 20 pounds frequently, sit for 4 hours at one time and for 8 hours total in an 8-hour workday, stand for 1 hour at one time and walk for 1 hour at one time and stand/walk for 4 hours total in an 8-hour workday," and do a variety of other actions with the exception of climbing ladders or scaffolds or having to frequently balance.[5]  [AR 33, 588-99]  The ALJ then cites to Dr. MaryAnn Wharry, Ph.D., who assessed Plaintiff's mental RFC and opined Plaintiff was "moderately" limited in an ability to carry out detailed instructions and interact appropriately with the general public but was "not significantly limited" in the remaining 18 out of 20 categories involving mental functioning.  [AR 34]  The ALJ quoted this expert as concluding Plaintiff was "capable of work of limited complexity but which requires accuracy and attention to detail, and can respond appropriately to supervision and coworkers but must have minimal to no interaction with the general public."  [Id.]  The ALJ then cites Dr. Pelc, the ME from the hearing, who concluded Plaintiff "was capable of both simple and complex functioning with an ability to understand, remember and carry out two- to three-step instructions" and was "limited to frequent interaction with the public, co-workers, and supervisors." [AR 34]

The ALJ summarized the medical expert opinion as follows:

> In sum, the above residual functional capacity assessment is supported by findings and opinions of State Agency physicians who previously examined the record and

---

[5]The Court notes the scant amount of information in this report, which contains one-word "yes" or "no" answers with no depth of analysis.  Even the section that asks the expert to circle how long Plaintiff could sit, stand, or walk has four of the six sections with one number scribbled out and a new number circled.

reported their opinion (such opinions by program physicians are afforded the weight of expert medical opinions by non-examining physicians in accordance with Social Security Ruling 96-6p), and the opinions of independent medical advisors (one factor in determining the nature and severity of a claimant's impairments []), including the opinions of Dr. Pelc, an independent psychological medical expert whom the undersigned finds has a thorough amount of understanding of the disability program and the evidentiary requirements and is familiar with the other information in a claimant's case record, considered all of the pertinent evidence in this claim, including opinions of treating and other examining sources, and provided explanations at the hearing and was available for cross-examination.  This RFC is furthermore consistent with the claimant's activities of daily living.  While the claimant's testimony was not edifying, as she had no idea how long she could walk or stand, the medical evidence of record indicates that, while she does have some limitations, such are not nearly as severe as the claimant indicates ..."[6]

[AR 34].

The ALJ then largely discounted records from treating physicians, as discussed *supra*, and rejected Plaintiff's disabled status before October 9, 2012, stating that no one involved in the case concluded that a Medical Listing was met or equaled.  [AR 29-30]

The ALJ then found a second RFC for Plaintiff starting as of October 9, 2012, awarding her disability benefits from that point forward.  [AR 35]  The ALJ noted that he made this decision by looking at an independent functional abilities evaluation of Plaintiff by an occupational therapist; the ALJ concluded that at that time "the claimant's pyschological functions beginning on October 9, 2012, are essentially unchanged ... however, the claimant's physical functioning has

---

[6]Here, yet again, the Court notes the error in the ALJ's recitation of the record.  As noted *infra* regarding the hearing testimony, Dr. Pelc did not indicate a firm grasp of the record.  He testified he had scanned much of it, looking only for those materials relating to his area of speciality – psychology.  He also clearly stated that he could not opine on anything but that area of speciality.  The ALJ's reliance on Dr. Pelc for anything involving physical conditions was thus, at best, misplaced, as the Court discusses *supra*.

deteriorated."[7]  [*Id.*]   He noted her double vision [AR 606] and Physical Demand Characteristics scores being at the sedentary level [AR 609-37]. [*Id.*]

Plaintiff sought partial review of the ALJ's decision by the Appeals Council on December 12, 2012.  [AR 21]  Plaintiff submitted additional evidence to the Appeals Council as part of the review process.  [AR 14-22]  On May 28, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 3-7]  Plaintiff timely filed her Complaint in this matter on July 24, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following issues: (1) the ALJ did not properly evaluate Plaintiff's complaints of pain; (2) the ALJ did not properly weigh the medical evidence; (3) the ALJ did not properly determine Plaintiff's RFC; and (4) the ALJ did not properly apply the GRID rules.

## ANALYSIS

The Court will begin its analysis with the second issue raised by Plaintiff, concluding with a summation of the other three arguments.

### I.      Whether the ALJ Properly Weighed the Medical Evidence

Plaintiff argues that the ALJ did not perform the appropriate analysis of medical evidence and failed to give good reasons for elevating the opinions of non-treating and non-examining physicians above those from providers who had a treatment relationship with her.  Plaintiff's Opening Brief, docket #13 at 8.

---

[7]This decision is not being appealed, so the Court will not address it further.

Defendant counters that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled before October 9, 2012, and that the ALJ reasonably weighed the medical source opinions. Defendant's Response Brief, docket #16 at 6, 10. Defendant cites to *Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) for the proposition that Plaintiff's challenges regarding the weighing of the medical evidence are lacking legal authority or argument. Defendant's Response Brief, docket #16 at 11. However, the Court notes that *Eateries* discusses a complete void of any authority in a breach of contract case where the Tenth Circuit warned: "We need not sift through the record to find [evidence to support a party's argument], nor manufacture a party's argument for [it]." *Eateries*, 346 F.3d at 1232. Plaintiff plentifully cites to the record and to legal authority; thus, the Court rejects Defendant's contention. Further, the Court finds that the ALJ did not reasonably evaluate and weigh the varying medical opinions, particularly of treating physicians, as discussed *supra*.

"[A]n ALJ must evaluate every medical opinion in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing former 20 C.F.R. § 404.1527(d)); *see also* 20 C.F.R. § 416.927(c). Furthermore, the social security regulations state that, unless the treating source opinion is given controlling weight (which did not occur here), the ALJ "must" explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2)(ii) (stating that the agency generally "give[s] more weight to the opinion of a source who has examined. The social security rulings require that an ALJ "may not ignore [the opinions of state agency consultants] and must explain the weight given to these opinions in their decisions." SSR 96-6P, 1996 WL 374180, at *1 (July 2, 1996)).

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)). "An ALJ may dismiss or discount an opinion from a medical source only if his [or her] decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if he [or she] provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)). "However, an ALJ need not 'apply expressly each of the six relevant factors in deciding what weight to give a medical opinion,' so long as he provides 'good reasons in his decision' for the weight accorded to each opinion." *Thielemier v. Colvin*, No. 12-cv-03178-PAB, 2014 WL 1292885, at *3 (D. Colo. Mar. 31, 2014) (quoting *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)).

In addition, "[a]n ALJ's rejection of a medical opinion based on an incorrect reading of the record is grounds for remand." *Sedlak*, 2014 WL 717914, at *10 (citing *Mercer v. Colvin*, No. 12-CV-35-FHM, 2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013)). Further, an ALJ may not consider only portions of the evidence favorable to the determination; to do so is error. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) ("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

18

Here, the Court finds that the ALJ failed to take into account the treating physicians opinions.  Plaintiff notes and the Court agrees, for example, that the ALJ failed to take into account or even mention Plaintiff's visual impairments that pre-existed the date he found her disabled; the impairment did not become suddenly more limiting on October 9, 2012, the date he found her disabled.  Plaintiff's Reply Brief, docket #17 at 2.  The ALJ also did not indicate that she has coccydynia, which limits her ability to sit.  *Id.*  Meanwhile, the ALJ largely ignored the opinions of treating physicians, discounting them as narrative.  Plaintiff's Opening Brief, document #13 at 7.  The Court's review of the record finds that the treating physicians expressed clear opinions that the ALJ should have taken into consideration or explained, per *Sedlak*, his reasoning for giving them so little weight.  [AR 300-01; 360-61; 529-32]  The Court notes information in Dr. Keeling's report dated January 28, 2011:

> Ms. Tafoya is a 52 year old woman first seen in 1992 complaining of long standing depression.  She was initially diagnosed with major depression, recurrent, without psychotic features. ... She was treated with Prozac with good response until 1995.  At that time the diagnosis of Bipolar Disorder, Type II was made and lithium was started. ... She had a good response and was able to work as a farrier with good functioning.  Unfortunately she had an injury due to being kicked by a horse and was unable to continue in this occupation.  She did work as a clerical assistance [*sic*] and apartment building manager following that until 2009 when the position was eliminated.  Her mood was fairly stable until 2006 and since then trials of [various drugs] were begun but her mood has gradually become more unstable and several medications have had unacceptable side effects.  In 2008 she began to notice significant difficulties with memory.  In 2010 she developed renal disease, probably due to taking lithium for 15 years and had to stop taking the lithium which had been the most effective medication for her. ... I do not believe she can work in any form of competitive employment at this time. ... She has had a variety of other medical problems including hypothyroidism, pernicious anemia, various gastric problems including a diagnosis of Chron's disease, dyslipidemia, arthritis, osteopenia, allergies, sleep apnea and renal failure.

[AR 300-01]  The Court also notes the information in Dr. Marumoto's report dated August 30, 2011:

> Her diagnosis is Bipolar Disorder, Type II, and she has been difficult to treat because of extreme sensitivity to side effects from medications.  Her previous psychiatrist Dr. Keeling has already written a summary of treatment . . .   Since I have been seeing [for the past five months] Ms. Tafoya, I have increased her topiramate dose as recommended by Dr. Keeling.  She is currently on [long list of medications omitted].  I have tried her on citalopram and then fluoxetine to try to lesson her irritability, but she had nausea, shaking, insomnia, sexual side effects and worsened Chron's disease symptoms. . . .  Ms. Tafoya has had a number of closed head injuries and has sleep apnea; she has some significant cognitive deficits along with her physical limitations and chronic pain. . . .  Physically, she has chronic leg and back pain with recent diagnosis of a bulging disc at L4-5 and a torn disc at L5-S1.  She has nerve damage affecting both hands, R>L.  She has myalgias and arthritis due to her Chron's which flares up in spite of medications every 4-5 weeks.  She has chronic gastritis.  Her vision is poor due to her exophthalmos from her Graves disease.  Her short term memory is so impaired that she cannot hold a conversation as she can't recall what was just said.  She has difficulty with word finding.  And on top of this, she is very irritable and gets agitated when she tries to converse and has trouble and this makes her word finding and focus worse.  She dissociates at times which makes her feel out of control.  She has some impulse dyscontrol in terms of saying things which she immediately regrets (frontal lobe damage).  She can't make simple decisions because she can't hold in her mind the pros and cons of all her choices.  And all these cognitive problems are worsened by her depression and inability to sleep.

[AR 361-62]

The Court also notes that Plaintiff's primary care physician, Dr. Turk, reported that Plaintiff has Chron's, hypertropia and diplopia causing double vision, arthritis and balance problems making it difficult to stay in one position, bipolar disorder that is difficult to control with medication, poor focus and decision making.  [AR 364-70]

The ALJ  essentially dismissed the records of Plaintiff's treating physicians.  [AR 34-35]  The ALJ writes that he "has considered the statements and opinions from Dr. Turk," Plaintiff's primary care doctor.  [AR 34]  He found her opinions "are not wholly inconsistent with the above

20

residual function capacity as she in fact opined greater functioning as that found above in her opinion that the claimant could lift 20 pounds occasionally and carry 10 pounds" and that she could do a variety of other tasks.  [AR 34-35]   However, the ALJ notes that Dr. Turk's opinion that Plaintiff "can only sit for 10 minutes at one time and for 4 hours total in an 8-hour workday, stand for 10 minutes at one time and for 2 hours in an 8-hour workday, and walk for 10 to 15 minutes at one time and for 1 hour total in an 8-hour workday" was not supported by "treatment records" or "indeed the record as a whole" and "thus less weight is afforded to these opinions."  [AR 35]

Next, the ALJ indicates he also considered the statements and opinions from treating physician Dr. Marumoto but that he "affords less weight to these opinions."  [AR 35]  He writes:

> While Dr. Marumoto opined that Plaintiff had some "significant cognitive deficits," she fails to quantify "significant," but at any rate, the claimant's own reported functioning of an ability to "follow 3-step directions well, do pretty well handling stress, and do very well handling changes in routine," contradicts this statement, and treatment records furthermore do not contradict the opinions of Dr. Wharry or Dr. Pelc.  It is also noted that Dr. Marumoto is a psychiatrist, who included the claimant had "physical limitations and chronic pain," and thus the doctor's opinion appears to rest at least in part on an assessment of an impairment(s) outside her area of expertise.[8]

[AR 35]  Notably, the ALJ did not even mention the opinions of Dr. Keeling, Plaintiff's treating psychiatrist for many years.

The Court is further skeptical of the ALJ's inappropriate weighing of the medical opinions

---

[8]The Court notes the irony that the ALJ discounts treating psychologist Dr. Marumoto's opinion as to Plaintiff's physical conditions but says he relied on psychologist/ME Dr. Pelc's opinion as to Plaintiff's physical conditions (even though Dr. Pelc stated clearly that had no opinion as to physical conditions).  [AR 34, 53-54]  Further, Dr. Marumoto's record shows detailed information about Plaintiff's cognitive challenges, counter to the ALJ's dismissal of her report for not quantifying "significant," as discussed *supra*.  [AR 360-62]

because the ALJ's opinion indicates haphazard treatment of the record and, as a result, misleading conclusions based on use of partial statements from medical providers. For example, the ALJ cites to Exhibit 2F, indicating a doctor's record of Plaintiff's history for fine tremor and sleep apnea, "however treatment notes around the alleged onset date indicate 'essential tremor, improvement' and 'sleep apnea – is doing well on CPAP,'" citing Exhibit 5F. [AR 260-61; 271-75] A more full reading of Exhibit 5F indicates patient "has improvement in her tremor on lower dose of lithium, *but with worsening of her bipolar.*" [AR 275 (emphasis added).] Further, while the ALJ indicates "sleep apnea – is doing well on CPAP," [AR 32], a thorough reading of the record cited by the ALJ indicates, "She is using the CPAP on a nightly basis *but does not notice any difference in her fatigue.* [AR 276 (emphasis added).] Even in the quote used by the ALJ: "Patient is doing well on CPAP" [AR 32, citing AR 276], the ALJ leaves out the next phrase, "Still with fatigue." [AR 276]

Further, in citing to the Plaintiff's activities of daily living, the ALJ does not cite to the record specifically, instead opting to say generally: "At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony) claimant reports that she attends to her own personal needs and hygiene, as well as those of her child ... ." [AR 33] The Court finds this at best a sloppy effort of findings of fact and is skeptical that the ALJ treated Plaintiff's claim with sincerity.

Accordingly, the Court finds the ALJ's decision is not supported by substantial evidence in the record as a whole, and the ALJ did not comply with the applicable legal standards by providing a specific, legitimate reason for according little weight to the opinions of treating physicians.

## II.      Remaining Issues

Plaintiff also alleges three other arguments: that the ALJ failed to make a finding in his decision regarding whether she had an impairment that could produce the lower back pain alleged; that the ALJ did not properly determine Plaintiff's RFC; and that the ALJ did not properly apply the GRID rules.  Plaintiff's Opening Brief, docket #13.

The Court "address[es] only so much of Plaintiff's arguments as are sufficient to require reversal."  *See Cross v. Colvin*, 25 F. Supp. 3d 1345 at 2 n.1 (D. Colo. 2014).  The Court expresses no opinion as to the Plaintiff's remaining arguments and neither party should take the Court's silence as implied approval or disapproval of the arguments.  *See Watkins*, 350 F.3d at 1299 ("We will not reach the remaining issues raised by appellant because they may be affected by the [administrative law judge's] treatment of the case on remand.").  The Court also does not suggest a result that should be reached on remand; rather, the Court encourages the parties and the ALJ on remand to consider fully and anew the evidence and all issues raised.  *See Kepler v. Chater*, 68 F.3d 387, 391-92 (10th Cir. 1995) ("We do not dictate any result [by remanding the case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case.") (citation and quotation marks omitted).  However, to the extent that a mishandling of the record by the ALJ infused the remainder of his conclusions, the Court encourages a more thorough handling of the record on remand.

### CONCLUSION

In sum, the Court concludes that the ALJ in this case failed to properly weigh the medical evidence and consider that evidence in the remainder of evaluation.  Accordingly, the Court finds

23

the final decision is not supported by substantial evidence in the record as a whole as it appears the

correct legal standards were not applied.  Therefore, the decision of the ALJ that Plaintiff Cherry

L. Tafoya was not disabled is **reversed and remanded** for further review and consideration.

Dated at Denver, Colorado this 15th day of July, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge